ELEANOR L. BERKSON, as Executrix of SEYMOUR BERKSON, Deceased, et al., Respondents, v. TIME, INCORPORATED et al., Appellants.

First Department, June 25, 1959.

*Harold R. Medina, Jr.,* of counsel (*Stephen E. O'Neil* with him on the brief; *Cravath, Swaine & Moore,* attorneys), for appellants.

*Charles Henry* of counsel (*McCauley, Henry & Brennan,* attorneys), for respondents.

BERGAN, J. In this action for libel instituted by the publisher and corporate owner of a leading metropolitan newspaper, the *New York Journal American,* against the corporate owner and editor of a national news weekly, *Time,* the basic legal problem is whether the publication is libelous per se.

If, as the court at Special Term decided, the publication is libelous, subsidiary questions would arise as to whether the plaintiff corporation has stated a cause of action without pleading pecuniary injury or damage to its credit; and whether, in the cause stated by the plaintiff publisher, the publication is sufficiently attributable to him. Since the action was instituted the individual plaintiff has died and the action is continued by his executrix.

To determine whether the material charged as defamatory is libelous per se the publication must be read in fair context and considered in its total impact. (Cf., as to libel, *Hartmann* v.

*Sun Print. & Pub. Assn.*, 74 App. Div. 282, 284; as to slander, *Hayes* v. *Ball*, 72 N. Y. 418, 420.) It seems important in the case before us that the whole text be read.

On January 21, 1957, under the heading of " The Press ", the following publication, as it is alleged, appeared in *Time*:

" BOMBS AWAY

" The ' Mad Bomber ' who has been busily planting home-made bombs around New York (Time, Jan. 7) has given the city's newspapers one of the best homemade stories in years. No paper has matched the space or the big black headlines that Hearst's Journal-American has given the case. But last week, after the Journal received a surprisingly frank letter from the bomber and had the chance to score the most sensational beat on the story to date, Scripps-Howard's World-Telegram and Sun snatched the story away.

" When the Journal received the crudely printed letter (signature: F. P.), it decided to withhold the story from police and aim for the jackpot: the bomber's surrender. Instead of printing the letter, the Journal ran a wily item in its Personals column intimating that it would ' help ' the bomber if he gave himself up. The ad caught the eye of World-Telegram Managing Editor Richard Starnes, who guessed immediately that the Journal had received a letter from the bomber, checked out his hunch, and broke a Page One story on the bomber's ' new letter to a New York newspaper, hinting that he may declare at least a temporary truce.' Three days later, when most other New York papers had printed the story, the Journal-American's account finally appeared under an eight-column banner.

" The Mad Bomber's letter contained more clues to his identity than police had unearthed in years. Among the disclosures: he had spent ' most of my adult life in bed '; two of the bombs he had deposited last year had not yet been found; he named three former New York State officials who, he said, would ' know all '. The Journal gave the bomber's letter to police, who were able to eliminate hundreds of questioned signatures and narrow the search — as the press noted proudly — down to ' 42 suspects who are being followed night and day.' But at week's end the bomber was still at large — or in bed."

Unless this article can fairly be read as charging a crime, it is not libelous per se. We are of opinion it cannot fairly be read in that sense. There has been no demonstration that the acts stated in the publication constituted the violation of any penal statute; and thus the case is at once distinguishable from many cases in which a crime was charged.

To constitute a criminal act, it would normally be necessary, under circumstances such as those here disclosed, that some intention exist to shield the criminal or that an obstruction to public authority be shown.

The article complained of cannot possibly be read as charging any such intention or purpose. On the contrary, the article infers, and indeed states expressly, that the newspaper was activated by a desire itself to capture the criminal. The argument of plaintiffs, that the publication charges an illegal act, rests entirely on pleaded innuendos which require strained construction of ordinary language; a construction the words do not carry.

The court at Special Term did not sustain the complaint because the publication charged a crime; it was sustained, in the view taken by the Judge, because the article " may conceivably have caused readers   *   *   *   to lose confidence in its [the newspaper's] reliability ". (10 Misc 2d 189, 190.)

The plaintiffs argue on appeal that they were being charged with being accessories to the Mad Bomber's crime within section 2 of the Penal Law; but the publication cannot reasonably be read as saying, within the frame of the statute, that the newspaper aided the offender " with intent that he may avoid or escape from arrest ".

No possible pleading of construction or innuendo can convert this publication into a charge of such a crime when its plain text is read fairly; and the willful obstruction of a public officer in performance of a duty (Penal Law, § 1851) is even more remote from its language.

In dealing with published language as plain and as unmistakable as this, there is no room left for pleading innuendoes to suggest some other intent. (*Hays* v. *American Defense Soc.*, 252 N. Y. 266, 269.) The words will be read the way they are.

To be actionable per se, the publication must either charge a crime involving moral turpitude (*Martin* v. *Stillwell*, 13 Johns. 275; *Halstead* v. *Nelson*, 36 Hun 149, 153) or it must import, as Scott, J., noted in this court in *Church* v. *Tribune Assn.* (135 App. Div. 30, 31) " a criminal or disgraceful charge ". A libel must, as Judge Crouch noted in *Kimmerle* v. *New York Evening Journal* (262 N. Y. 99, 102) " appreciably affect reputation ".

The words must state, or reasonably imply, a discreditable or disgraceful thing; some wrongdoing; some circumstance which will expose the complaining party to contempt or scorn.

Some of those elements were illustrated by Hubbs, J., in *Hays* v. *American Defense Soc. (supra).* The criteria are standard measurements for the examination of publications charged

to be defamatory (53 C. J. S., Libel and Slander, § 13 *et seq.*, p. 57).

These well-settled and well-understood principles underlying the concept of defamation are closely drawn together and summarized in Restatement of the Law (Torts, § 559) by stating that " A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him "; and, as to corporations (§ 561, subd. [1]) that it " tends to prejudice it in the conduct of its trade or business or to deter third persons from dealing with it ".

In our view the offending publication relied upon describes an effort to utilize information, coming gratuitously to the newspaper, to outrun the police in leading to the detection of a criminal. There is nothing defamatory in this; what is published is not criminal and it is not disgraceful; nor does it meet any of the common criteria by which a libel is tested.

The order should be reversed on the law and the complaint dismissed, with costs to appellants.

RABIN, J. P., VALENTE and McNALLY, JJ., concur; M. M. FRANK, J., dissents and votes to affirm.

Order reversed on the law, with $20 costs and disbursements to defendants-appellants, and the motion granted with $10 costs, and the clerk is directed to enter judgment in favor of the defendants dismissing the complaint, with costs.