Matthew J. LAWLOR, Plaintiff,

v.

The GALLAGHER PRESIDENTS' RE-
PORT, INC., et al., Defendants.

No. 73 Civ. 5443–LFM.

United States District Court,
S. D. New York.

May 13, 1975.

Richard Ives Rudell and Davis J. Stolzar, New York City, for plaintiff.

Townley, Updike, Carter & Rodgers, New York City, for The Gallagher Presidents' Report, Inc. and Cynthia A. Billings; John Paul Reiner and Raymond J. Soffientini, New York City, of counsel.

Proskauer, Rose, Goetz &. Mendelsohn, New York City, for Gulf & Western Industries, Inc., David N. Judelson and Martin S. Davis; Steven J. Stein and Jonathan M. Herman, New York City, of counsel.

## OPINION

MacMAHON, District Judge.

Plaintiff Matthew J. Lawlor, former vice-president of employee relations at Gulf & Western Industries, Inc. ("G & W"), brings this diversity action for libel alleging three claims for relief. The parties waived a jury and the case was tried to the court.

The first claim, brought against defendants David N. Judelson and G & W, alleges that Judelson, in his capacity as president of G & W, during a meeting held April 26, 1973, "in the presence of plaintiff and other persons," uttered the following false and defamatory statements of and concerning plaintiff: " . . . You went crazy this last year —you have been grossly guilty of conflict of interest," and "[y]ou and that McDermott set up the Mark Group, opened a bank account and hoped to get away with a great deal of money. . . ." Upon the trial, plaintiff was allowed to amend his complaint to allege that during the meeting Judelson also made other statements, set forth in the margin,[1] which are alleged to be false and defamatory.

1. "You don't feel, Matt, that there's any conflict of interest between your getting resumes here and giving them to the Mark Group, and having them place the people and getting a fee? Right?"
"You, in fact, Matt, have gotten letters, from people, looking for jobs, innocently, that have been under the Mark Group letterhead, sent to people. You have received fees from Bushee and from, uh, uh, on this one placement—the fellow's name is Dambrosky, eh. . . ."
"I would say this Matt, that primarily is on the basis of this. I would say that if is, it has nothing to do what, what I consider to be totally fraudulent. I think your whole story here, is a, is a nice composite of what you think might be a plausible rationale for the whole situation, but I want to tell you that it absolutely defies gravity, I mean I refuse to accept anything you said Matt, I know exactly what was set up, I wasn't born yesterday. This company didn't get built by a bunch of idiots who happen to reside on the 42nd Floor, Matt. We are really not

stupid, or if we were, this company wouldn't be as big as it is. I find it, Matt, a disgrace, that an officer of this company would enter into something like this, unbeknown to myself, who you reported to, as an absolute subterfuge to go ahead and take fees in a situation where you obviously had all of the ability to get people who would write here for resumes and put them in, I could even see you placing Mr. Boester, your own employee."
"I think it is entirely frandulent Matt, it's an insult to my intelligence and everybody else's sitting in here that you would give this rationale for this story, you know it for what it is, I know it for what it is, Mr. McDermott definitely knows it for what it is, that there was an employee here receiving $21,000 a year in the name of this man, right? What was using his secretary to type up resumes."
"Now Matt, I told you, I gave you confidence when you came here, you did not return it Matt, in fact, you might have flipped a gear someplace along the line here, and is

The second claim, brought against defendants G & W and Martin S. Davis, alleges that Davis, in the course of his employment as senior vice-president of G & W, falsely stated to defendant Cynthia A. Billings, president and editor of The Gallagher Presidents' Report, Inc. ("Report"), or to one of its employees, that "plaintiff had extracted fees from GULF for placement of executives with GULF" and that as a result of Davis's statement "BILLINGS caused REPORT to publish the said statement by DAVIS in its May 22, 1973 edition of 'The Gallagher Presidents' Report.' "

The third claim, brought against Davis, Billings and Report, alleges that Davis maliciously intended that his statements to Billings be published in Report and that on May 22, 1973 defendant Billings maliciously caused Report to publish the following matter of and concerning plaintiff:

" 'CHARLIE WONDERFUL' BLUHDORN CRACKS DOWN ON EXECUTIVES. Gulf + Western Industries chairman forced to oust Matthew Lawlor two weeks ago after discovery of questionable practices by Lawlor as v-p employee relations. Lawlor in charge of G + W personnel department. Reportedly set up dummy corporation Mark Group. Opened bank account for dummy corporation. Channeled unsolicited job resumes to Mark Group. *Extracted fees for placement of executives with G + W.*

Charlie eliminates title. Turns over Lawlor's duties to director of personnel David Foreman." (Emphasis supplied.)

Plaintiff claims that, as a consequence of the alleged defamation, he was forced to resign from G & W, has been unable to obtain other employment, has been damaged in his reputation and credit, and has suffered pain and mental anguish, all to his damage, in the amount of $2,000,000 on each claim.

Defendants G & W, Judelson and Davis deny the substance of each of the allegations and allege affirmative defenses of failure to state a claim, truth, fair comment, good faith and qualified privilege based upon both interest and duty, and counterclaim for relief in the form of a judgment directing plaintiff to account for, and pay over to G & W, all of the proceeds he received from his unauthorized exploitation of special knowledge, resources and information belonging to G & W which had been entrusted to him. Alternatively, these defendants seek damages arising out of plaintiff's breach of his fiduciary duties as a corporate officer.

Defendants Report and Billings generally deny the allegations of the third claim, but admit the publication of the alleged defamatory article and assert the affirmative defenses of failure to state a claim, truth and privilege under the First Amendment.

---

very obvious in case you want to know about it the Management Resources opened up your eyes to what could be done outside of the company, rather than inside of the company, and that's why the Mark Group was formed."

"But I want to tell you Matt, I'm not going to stand for it, I won't have for one second. I think that you must have been absolutely crazy, Matt. I'm not trying to give you a lecture, but you have gone ahead and you've ruined the job that you have here, you can get no recommendation from me, Mr. Lawlor for any possible job."

"And I can really throw it at you, Matt. I could give you so much trouble, that you'll never want to wake up. Now, I'm not going to do that for one reason, Mr. Lawlor, I know you have a family, and I feel for your kids, I want to tell you that. And I shouldn't feel this way, and I know God-damned well I shouldn't, because I should be as high as my standards are with regard to this. I should be just that tough, too, when it comes to something like that."

"But don't expect me, or anybody else in this room, or anybody else on this floor, to accept the God-damned travesty that you've tried to perpetrate as the, as the purpose behind doing this whole thing. It is so deceitful, Matt, that it's even unbecoming to you to sit here and try to tell me that. Do you think I'm that stupid—do you really think that?"

## CHOICE OF LAW

 Since jurisdiction is based on diversity, we must apply the choice of law rules of New York, the forum state.[2] The applicable New York rule requires a "governmental interests analysis" which looks to "the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties has the greatest concern with the specific issue raised in the litigation."[3]

 The specific issues raised here involve alleged slanderous and libelous statements made in New York. The individual defendants were all employed and present in New York City when the statements were made, and each of the corporate defendants has a principal place of business in New York. All parties agree that New York law applies. We will, therefore, apply New York law since New York appears to have the most significant contacts with the issues and the parties and the greatest interest in having its law apply.[4]

We turn now to consideration of the first claim.

## PLAINTIFF'S FIRST CLAIM

The testimony upon the trial established that plaintiff, as G & W's vice-president of employee relations, was entrusted with the resumes and applications for employment submitted by persons seeking positions with G & W.

In early 1973, G & W hired a private investigator, Jeremiah McAward, to investigate internal "leaks" of confidential information and breaches of security at G & W. The investigation, including a search of plaintiff's desk and file cabinets, revealed that plaintiff and certain of his subordinates had apparently set up their own executive recruiting firm, known as the "Mark Group;" appropriated resumes and applications submitted to G & W; sought to place such applicants with outside companies on a commission basis; opened a bank account in Stamford, Connecticut, near plaintiff's home; and had a mailing address and telephone answering service in Stamford.

McAward reported this information to Judelson, and on April 26, 1973, Judelson, Davis, Bob Jones (G & W's counsel) and McAward met in Judelson's New York office. After discussing McAward's report, a tape recorder was set up and plaintiff was called into the meeting for an explanation. Transcripts of the recordings were received in evidence, and there is no dispute that the statements spoken at that meeting were those alleged by plaintiff. The essential issue, therefore, on this first claim is whether the statements were defamatory.

 Under New York law, injury to reputation is the gist of an action for defamation. Any published communication, spoken or written, of and concerning the plaintiff, without lawful justification or privilege, which accuses him of a crime[5] or tends to expose him to public contempt, scorn, obloquy, ridicule, shame or disgrace, or to induce an evil opinion of him in the minds of right-thinking persons, or to injure him in his profession, occupation or trade, is defamatory.[6]

2. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Rosenthal v. Warren, 475 F.2d 438 (2d Cir. 1973).

3. Babcock v. Jackson, 12 N.Y.2d 473, 481, 240 N.Y.S.2d 743, 749 (1963).

4. At trial, the parties agreed that New York law applied for determination of all issues.

5. Berkson v. Time, Inc. (1st dep't), 8 A.D.2d 352, 187 N.Y.S.2d 849 (1959), aff'd, 7 N.Y. 2d 1007, 200 N.Y.S.2d 51, 166 N.E.2d 847 (1960); Frechette v. Special Magazines, Inc. (3d dep't), 285 App.Div. 174, 136 N.Y.S.2d 448 (1954).

6. Hahn v. Andrello (4th dep't), 44 A.D.2d 501, 355 N.Y.S.2d 850 (1974); Kimmerle v. New York Evening Journal, Inc., 262 N.Y. 99, 186 N.E. 217 (1933); W. Prosser, Law of Torts § 106, at 756 (3d ed. 1964).

Essentially, Judelson accused plaintiff of engaging in conflicting self-interest by establishing and operating an outside executive employment agency known as the "Mark Group," misappropriating resumes sent to G & W by executives seeking employment, giving them to the Mark Group, placing the executives with outside companies for commissions, and wrongfully using time, manpower and material belonging to G & W for the benefit of the Mark Group. These statements unquestionably injured Lawlor's reputation, exposed him to shame and disgrace, and injured him in his profession and occupation, and were, therefore, defamatory if false.

Plaintiff admits that he formed and operated the Mark Group, substantially as stated by Judelson, but contends that the statements were, nevertheless, false because Judelson knew that the Mark Group was formed and its activities conducted solely for the benefit of G & W, that any profits made by the Mark Group were segregated and always belonged to G & W, and that Judelson gave him permission to embark on that venture on an experimental basis.

According to plaintiff's testimony, the idea originated from the fact that G & W is a large conglomerate corporation engaged in many diversified industries, employing hundreds of executives, and needing a reliable source for recruiting new talent. Lawlor, therefore, aware that there was undoubtedly considerable executive talent within the organization, approached Judelson with the idea of forming an in-house search company for recruiting and placing executives within G & W. Such a plan, Lawlor thought, would not only save the fees paid by G & W to outside search firms but also generate profits for G & W from fees charged for placing executives with outside corporations.

According to Lawlor, Judelson told him that if the company were successful, it would become a separate profit center for G & W. Although his testimony is unclear on the point, Lawlor implied that Judelson approved the plan of establishing such a company on an experimental basis. Lawlor, therefore, set up an executive employment agency, opened a bank account and gave the company an address and telephone listing, all under the name of the Mark Group, in Stamford, Connecticut, because he thought the placement business of the company would be more successful if it were not identified with G & W and because he did not want a company identified with G & W unless and until it became successful.

Except for admitting that he discussed the subject of an in-house search program with Lawlor, Judelson's testimony is in direct conflict with Lawlor's. Judelson testified that he expressly forbade Lawlor to form any organization for the purpose of placing executives applying for positions with G & W with any other corporation for fees. Referring to the alleged slanderous statements, he testified that he was simply confronting Lawlor with the fact that he had disobeyed instructions and calling on him for an explanation.

The transcript of the April 26 meeting is informative. It reveals that Judelson asserted, without denial, contradiction or even a defense by Lawlor, that when Lawlor had approached Judelson in 1972 about forming a G & W enterprise for placing executive applicants with outside corporations for fees, Judelson had indeed rejected the idea.

In light of Judelson's unimpeached trial testimony, corroborated by the transcript of the April 26, 1973 meeting, we conclude that Judelson rejected the idea of setting up an executive placement agency, whether as a G & W company or otherwise, and forbade Lawlor to engage in such placement activities for fees and ordered him to confine his activities to organizing resumes of all executives in G & W subsidiaries to facilitate filling internal vacancies when they occurred.

On cross-examination, plaintiff admitted that Judelson had ordered him to

terminate the employment of Richard Boester, G & W's director of personnel, serving under plaintiff. Plaintiff, nevertheless, offered the presidency of the Mark Group to Boester and suggested that he invest his termination pay from G & W in the Mark Group. Lawlor also admitted offering David Biondi, a G & W tax lawyer slated for termination, a job as general counsel to the Mark Group. The undisputed facts show that plaintiff established a bank account in Stamford, Connecticut, under the name of the Mark Group, although the policy of G & W required that the accounts of any subsidiary company of G & W be conducted by the vice-president in charge of banking affairs. Plaintiff also established a mailing address and answering service for the Mark Group in Stamford, Connecticut.

An examination of the testimony of Lawlor and Biondi, as well as an organizational chart prepared by Lawlor, shows that the Mark Group was to be part of a system called "MJL Enterprises." Plaintiff admitted that MJL Enterprises was an extension of himself, Matthew J. Lawlor, and that he took $14,870 worth of deductions under its name on his 1973 personal income tax return. Plaintiff also admitted that he did not discuss the Mark Group project with any of his superiors during the period of its operations.

In addition, McAward's investigation revealed that plaintiff was using his time, that of G & W's employees, and G & W's facilities and materials for the work of the Mark Group.

■ These facts compel the conclusion that Lawlor was operating the Mark Group as a private business venture of his own, in no way connected with G & W, and that he did not have the intention of making the Mark Group a G & W corporation when, as, and if it became successful.

The conflict of interest policy statement of G & W provides, in pertinent part:

"To avoid the possibility that conflicts of interest may arise or exist between the company and its employees, no employee shall have any relationships or engage in any activities which will impair their independence or judgment. . . . If any possible conflict of interest arises, the individual employee must disclose all facts relating thereto to his immediate superior."

Lawlor, through the activities of the Mark Group, assumed a position of conflicting self-interest which tempted him to favor the Mark Group, his own employment agency, to the disadvantage of G & W, by placing executives who had applied to G & W with outside corporations for a fee, instead of placing them with G & W. This plainly conflicted with his fudiciary duty of loyally recruiting the best executives for G & W. Moreover, he misappropriated the executive resumes and misapplied the time and talents of G & W's personnel, as well as its materials, for his personal advantage. Finally, he failed to disclose any of these activities to Judelson, his immediate superior. Lawlor, thus, placed himself in a position of conflicting self-interest with his employer.

■ We conclude, therefore, that Judelson's statements about Lawlor at the April 26 meeting were essentially true. Since truth is a complete defense to liability for defamation,[7] there is no need to consider the other defenses raised by defendants, and, accordingly, we dismiss the first claim against G & W and Judelson.

We turn now to consider plaintiff's second claim.

### PLAINTIFF'S SECOND CLAIM

Here, plaintiff alleges that Davis, in the course of his employment with G & W, stated to Report's editor, Billings,[8]

---

7. Curtis Pub. Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) ; Crane v. New York World Telegram Corp., 308 N. Y. 470, 126 N.E.2d 753 (1955).

8. Neither Report nor Billings is named as a defendant in the second claim.

or to one of its employees, that "plaintiff had extracted fees from GULF for placement of executives with GULF." Plaintiff further alleges that the statement was false and defamatory and that defendant Billings caused Report to publish the statement, all to plaintiff's damages. We will later discuss the defamatory nature of the alleged statement, but, assuming that the statement is defamatory, plaintiff still cannot recover on his second claim.

■ Plaintiff offered no direct evidence that Davis ever made any statement, defamatory or otherwise, about him to Billings or to anyone else connected with Report. Instead, he testified that Davis harbored animosity toward him because of an incident in which he had embarrassed Davis in front of top management and because of rumors he had heard from other executives to the effect that Davis was out to get him. On the basis of nothing but this flimsy evidence, plaintiff asks us to draw the inference that, since Davis was present when Judelson's statements were made, Davis was the person who conveyed the defamatory statements about plaintiff's Mark Group activities to Billings and Report. We think the evidence insufficient to support the inference which plaintiff seeks to draw.

Davis testified unequivocally that he did not communicate with Billings or anyone else concerning plaintiff, the statements made at the April 26 meeting or the Mark Group incident. Davis is corroborated by Billings, who testified, *in camera,* where she revealed her sources, and Davis was not among them.

Finally, Lawlor testified on cross-examination that he had discussed the April 26 meeting with four of his associates. Since it is just as likely that one of those persons repeated the story to others, we cannot draw the inference that Davis was the person who spread the contents of the April 26 conversation

either directly to Billings, to anyone connected with Report or to any one of Report's sources.

Accordingly, we dismiss the second claim against Davis and G & W for failure of proof.

We turn to consideration of plaintiff's third claim, which is brought against defendants Report, Billings and Davis.

## PLAINTIFF'S THIRD CLAIM

Here, plaintiff reasserts the second claim's allegations against Davis[9] and adds that Billings caused Report maliciously to publish an allegedly defamatory article about him in its May 22, 1973 edition, which stated:

" 'CHARLIE WONDERFUL' BLUHDORN CRACKS DOWN ON EXECUTIVES. Gulf + Western Industries chairman forced to oust Matthew Lawlor two weeks ago after discovery of questionable practices by Lawlor as v-p employee relations. Lawlor in charge of G+W personnel department. Reportedly set up dummy corporation Mark Group. Opened bank account for dummy corporation. Channeled unsolicited job resumes to Mark Group. Extracted fees for placement of executives with G+W. Charlie eliminates title. Turns over Lawlor's duties to director of personnel David Foreman."

There is no dispute that the above article was published of and concerning plaintiff. We turn, therefore, to consideration of whether the article is defamatory.

■ Plaintiff contends that the statement "[e]xtracted fees for placement of executives with G+W" is false and defamatory and so distorts the story as to make the entire article false and defamatory. In determining whether words are defamatory, New York law teaches that words must be defined as persons generally understand them in the

---

**9.** Our dismissal of the second claim against defendant Davis also requires dismissal of the third claim as to him.

context in which they are used.[10] The first phrase of the statement is "[e]xtracted fees." "Extracted," used together with "fees," can only mean "to draw forth against a person's will"[11] or "to extort."[12] The second part of the statement reads "for placement of executives with G+W." Read in context, a reader would undoubtedly understand the statement to mean that plaintiff formed the Mark Group as a dummy corporation, channeled unsolicited job resumes of executives seeking employment with G & W to the Mark Group, and used his position as G & W's vice-president of employee relations to compel "kickbacks" from executive applicants to G & W as a condition to placing them with G & W. The statement, if false, is therefore libelous since it accused plaintiff of a crime,[13] specifically, violating New York's kickback statute.[14]

■ Even assuming that the statement did not accuse plaintiff of criminal conduct, it was, nevertheless, libelous because it clearly intended to expose him to shame or disgrace, induce an evil opinion of him in the minds of right-thinking persons, and injure him in his occupation and profession as a specialist in employee relations.[15]

We will now determine whether the statement was false, as plaintiff contends, or substantially true, as defendants contend.

■ The question to be answered, as formulated in Fleckenstein v. Friedman, 266 N.Y. 19, 23, 193 N.E. 537, 538 (1937), is "whether the libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced." Plaintiff argues that the challenged statement is entirely false. Defendants [16] argue that, although plaintiff did not extract fees for placing executives with G & W, he did charge a fee for placing a G & W tax lawyer, David Biondi, with Raybestos-Manhattan, an outside corporation, and that the difference between that act and those charged in the statement is insignificant in terms of its effect on the reader.

We turn now to an examination of the evidence in light of the contentions.

10. Crane v. New York World Telegram Corp., *supra*; Tracy v. Newsday, Inc., 5 N. Y.2d 134, 182 N.Y.S.2d 1, 155 N.E.2d 853 (1958). In analyzing the article, we will assume that the reader had no independent knowledge of the April 26, 1973 meeting.

11. Oxford English Dictionary (1971).

12. The Random House Dictionary of the English language (1969).

13. Berkson v. Time, Inc., *supra*; Frechette v. Special Magazines, Inc., *supra*.

14. Section 198–b(2) of the N.Y.Labor Law (McKinney's Consol.Laws, c. 31, 1965, Supp. 1975), entitled "Kickback of Wages Prohibited," reads, in pertinent part, as follows:
"Whenever any workman who is engaged to perform labor shall be promised an agreed rate of wages for his services . . . it shall be unlawful for any person . . . to request, demand, or receive either before or after such workman is engaged, a return, donation or contribution of any part or all of said workman's wages, salary, or other thing of value, upon the statement, representation, or understanding that failure to comply with such request or demand will prevent such workman from procuring or retaining employment."
Section 198–b(5) of this statute provides that:
"A violation of the provisions of this section shall constitute a misdemeanor."
Article Six of the N.Y.Labor Law, of which § 198–b(2) is a part, was designed to regulate the wages paid to employees in New York. It spells out the procedures by which wages are to be paid and the civil and criminal penalties for failure to comply with these provisions. Section 198–a, the general criminal provision of Article Six, states that the criminal penalties of the Article apply to all employer-employee relationships. We conclude, therefore, that the New York Legislature did not intend that the term "workman" in § 198–b(2) be interpreted to refer only to manual laborers but intended that it be broadly construed to refer to any employee, including executive employees. Thus, the kickback statute would cover the acts Lawlor was accused of doing.

15. Hahn v. Andrello, *supra*.

16. In this section, "defendants" refer only to Billings and Report.

Lawlor's uncontradicted testimony is that he placed only two executives through the Mark Group. The first executive, Charles Tomlinson, was in no way connected with G & W. He was placed by Lawlor with an outside corporation, Polymer Industries, which then paid a fee to the Mark Group for services rendered.[17] Plaintiff also charged a fee, through the Mark Group, for placing David Biondi, a G & W tax attorney, with Raybestos-Manhattan, also an outside corporation. Lawlor further testified, without contradiction, that Judelson had ordered him to find a job for Biondi with an outside corporation as a way of getting rid of him. Plaintiff was in the process of doing so when he was approached by Lee Zetlin, who ran a search firm and was looking for a tax lawyers on behalf of Raybestos-Manhattan. Lawlor and Zetlin then successfully placed Biondi and split the fee. Lawlor deposited the fees for both of these transactions in the Mark Group's bank account.

This undisputed evidence shows unmistakably that plaintiff, however questionable his practices, did not extract a fee from unwilling executives for placing them with G & W. Indeed, neither executive paid any fee at all to anyone. Instead, the true fact, which was omitted from the article, was that two outside corporations willingly paid fees to Lawlor, through the Mark Group, for recruiting executives for them.

Although publication of the truth would undoubtedly cause the reader to conclude that Lawlor deserved censure for engaging in a conflict of interest, it could not conceivably have led the reader to conclude that Lawlor was guilty of taking kickbacks for performing his duty of placing executives with G & W. The published statement, therefore, so distorted the truth and magnified the wrong that it unquestionably made a graver impact and inflicted more devastating injury on plaintiff's reputation in the mind of the reader than the truth would have produced.

We find, therefore, that the statement "[e]xtracted fees for placement of executives with G + W" was false and that its publication so distorted the truth as to make the entire article false and defamatory.

We turn now to consideration of whether the statements and article were privileged under the First Amendment.

It appears from the evidence that plaintiff holds no public office, does not have general fame or notoriety in the community, has no pervasive involvement in public affairs and has not injected himself into a public controversy. He is, therefore, neither a public official nor a public figure.[18] Defendants conceded as much upon the trial but, nevertheless, contend that since plaintiff was a high corporate executive in one of the "top 100 corporations" and Report is directed exclusively to that group, we should find that plaintiff was a limited public figure for the limited public event of the Mark Group incident and allow them to invoke the qualified privilege of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L. Ed.2d 686 (1964). We think the contention untenable for such a rule would sweep all corporate officers under the restrictive *New York Times* rule and distort the plain meaning of the public official or public figure category beyond all recognition.

Clearly, the State of New York has a strong and legitimate interest in compensating private individuals for actual injury to reputation, but under Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), it may not permit recovery of presumed or punitive damages at least when liability is not based on a showing

---

17. It is undisputed that corporations regularly pay fees to search companies for placing executives with them.

18. Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

of knowledge of falsity or reckless disregard for the truth.

■■■■ A newspaper or periodical which publishes defamatory falsehoods about an individual who is neither a public official nor a public figure may not claim a constitutional privilege against libel for the actual injury inflicted by those statements. As the Supreme Court said in *Gertz, supra,* 418 U.S. at 340–347, 94 S.Ct. at 3007:

"[T]here is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues. . . .

The legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood. . . .

[S]o long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual."

Consequently, the Supreme Court held that, when the substance of the defamatory statement makes substantial injury to the reputation apparent, the state is free to allow recovery of compensatory damages by a private individual for injury to his reputation caused by a defendant's negligence in publishing false and defamatory statements about him. Examination of New York decisions since *Gertz* shows that the New York courts have adopted its negligence standard.[19]

There is no showing here that defendants had actual knowledge that the article was false. We turn, therefore, to consideration of whether defendants published the article with reckless disregard of whether it was false or not or was negligent.

Billings testified that her original source for the article was a professional journalist known to her for approximately six years. She said:

"The information I received was that Mr. Lawlor at Gulf & Western had recently been ousted due to some questionable practices involving an organization called the Mark Group which involved using unsolicited resumes, and that there were fees involved in working with these unsolicited resumes."[20]

It is clear that Billings's initial source did not inform her that Lawlor had "extracted fees for placement of executives with G & W" but had given her a generalized and incomplete version of what had occurred.[21] Billings then gave this

---

19. The following New York decisions have applied the negligence standard where a private person, not involved in a public controversy, seeks to recover for publication of a defamatory falsehood about him: Caldwell v. Bantam Books, Inc. (Sup.Ct., N.Y.Co.1974), reported in N.Y.L.J., Nov. 1, 1974, p. 17, col. 2; Bailey v. Hahn (Sup.Ct., Westchester Co. 1974), reported in N.Y.L.J., July 23, 1974, p. 12, col. 7.

Prior to *Gertz,* the New York courts allowed a private person, not involved in a public controversy, to recover simply by showing that defendant published a defamatory statement about him. See, *e. g.,* Corrigan v. Bobbs-Merrill Co., 228 N.Y. 58, 126 N.E. 260 (1920). This standard of strict liability was overruled by *Gertz.* See *Gertz, supra,* 418 U.S. at 347, 94 S.Ct. 2997. However, since this prior New York standard was less restrictive than the negligence standard, we conclude that when the New York Court of Appeals is faced with the question, it will follow these lower court decisions and adopt the negligence standard.

20. Tr. 341.

21. Later in her testimony, Billings was asked the source of each statement printed in the May 22, 1973 article about Lawlor. She responded that she got each statement from her original source and that Kenney confirmed each statement with his sources. This testimony directly conflicts with her earlier testimony that she only obtained a general version of the Mark Group controversy and that Kenney confirmed this general version. We find that this later testimony is self-serving and strains credibility, and we, therefore, will disregard it.

information to Robert Kenney, associate editor of Report, and when asked what Kenney did to confirm the information she replied:

"Well, Mr. Kenney had reported back to me that the information which I had given him checked out, and that his sources confirmed what my sources had given me."[22]

Billings also testified that Kenney told her that he had telephoned G & W to contact Lawlor, but that G & W had informed him that Lawlor was no longer there and had left no forwarding address. Billings's testimony about what Kenney told her is, of course, hearsay, but, even if we accept the hearsay, it amounts to an admission by Billings that Kenney only confirmed the general version of the story given to her by her initial source.

There is no evidence whatever that Kenney even knew, much less investigated, any accusation or information that Lawlor had extracted fees for placing executives with G & W. It is also clear that Kenney made no attempt, beyond a perfunctory and futile telephone call to G & W, to locate Lawlor to seek his version of the story; nor did he seek to interview any other executive of G & W prior to publication.

Kenney was not called as a witness, and, except for stating that he was no longer in Report's employ, there was no explanation for defendants' failure to call him. Beyond the hearsay, there is no evidence that Billings or Report made any effort whatever to check the accuracy of the false and defamatory article.

In light of these facts, we have no difficulty in concluding that defend-ants were negligent, for there can be no other plausible explanation for publication of the defamatory falsehood. Apparently, Billings carelessly distorted the information and magnified the wrong in order to sensationalize the story; or negligently misinterpreted the information she had been given; or negligently used inaccurate language to describe the true facts. Plainly, under any of those explanations, she was negligent both in interpreting the facts and in writing the article. Since each explanation involves negligence on the part of Billings, which is imputable to Report, we conclude that defendants were negligent and are liable to plaintiff for actual damages.[23]

## DAMAGES

Upon a showing that a defendant negligently published a defamatory falsehood about him,[24] plaintiff can recover "actual damages," including, in addition to out-of-pocket injuries, damages for impairment of reputation and standing in the community, for personal humiliation, and for pain and mental anguish. All damages awarded must be solely compensatory and supported by competent evidence showing the harm, although evidence of its dollar value need not be introduced.[25]

Plaintiff claims four items of damages: (1) inability to obtain other employment; (2) injury to reputation; (3) pain and mental anguish; and (4) injury to credit.

Plaintiff failed to introduce any evidence to support his claim that his credit was injured or impaired, and we therefore reject that item. Before discussing the remaining items, we must

---

22. Tr. 342–343.

23. Plaintiff, in an attempt to obtain punitive damages, argues that defendants published the defamatory statement with reckless disregard for its truth or falsity. In order to establish that defendants published the falsehood with reckless disregard, plaintiff must show that defendants published it with a "high degree of awareness of . . . probable falsity." St. Amant v. Thompson,

390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). An examination of the record reveals defendants Billings and Report did not publish the article with a high degree of awareness of its probable falsity, and plaintiff's contention is without merit.

24. See Caldwell v. Bantam Books, Inc., supra; Bailey v. Hahn, supra.

25. See Gertz, supra, 418 U.S. at 350, 94 S. Ct. 2997.

determine whether they were proved, and, if so, whether they were proximately caused by the negligence of defendants Billings and Report.

Plaintiff introduced evidence that he had a good reputation in the business community, which was undermined by Report's publication of the defamatory falsehood, and that this also caused him pain and mental anguish. Plaintiff also introduced evidence that he was a well-educated, talented and industrious executive in the labor relations field. His position at G & W placed him in charge of labor relations of a major multi-diversified company. He had been called to Washington, D. C., to discuss a position as undersecretary of labor. He was in his mid-forties, with bachelor and master's degrees from prestigious colleges, happily married, the father of two children, and a veteran of the United States Marine Corps.

It was established at trial that, before the article was published, the Mark Group controversy was not well known to the business community. Indeed, G & W maintained strict silence about the controversy, and the facts show that only a few individuals outside of G & W knew about it.

Report, by publishing the defamatory falsehood and circulating it to the business community, proximately caused harm to Lawlor's reputation and caused him to suffer great pain and mental anguish. William McCulloch, an executive search consultant, testified that Report was "public" to the business community. This testimony is supported by Billings's own admission that Report is directed almost exclusively to executives of the "top 100 corporations."

■ Since we have already held that the article reported that plaintiff was involved in criminal conduct in the performance of his duties as a G & W vice-president, we conclude that defendants' conduct proximately caused damage to plaintiff's reputation in his profession as a personnel director in the business community.

Plaintiff, by his demeanor and testimony, evidenced that he had suffered great pain and mental anguish as a result of the publication of the defamatory falsehood. Since his graduation from college in 1953, plaintiff had worked hard to establish his reputation as an expert in the labor relations field. Report, by publishing this falsehood about him, undermined twenty years of hard work and humiliated him before the community which had formerly recognized him as an expert.[26]

Plaintiff also claims that defendants' negligence is the cause of his inability to secure new employment. Plaintiff was forty-three years old at the time of the libel and contends that he is entitled to damages from that time until he reaches retirement, at the rate of $95,000 per year.

■ It is undisputed that Lawlor's inability to obtain employment is caused by (1) G & W's justified failure to recommend him, and (2) defendants' negligent publication of the defamatory falsehood about him. Under New York law, when two or more causes combine to produce a single result incapable of any logical division, such as plaintiff's inability to get a job, a determination must be made as to which cause was the substantial factor in bringing about the event.[27]

Plaintiff contends that, although G & W's refusal to hire him may have affected his ability to secure employment, the substantial cause of his inability to get a job is the publication of the false and defamatory article about him.

26. We recognize that if Report had printed the truth about Lawlor's involvement with the Mark Group, his reputation would have been tarnished and this fact will be considered in mitigating the damages awarded to plaintiff.

27. See Dunham v. Village of Canisteo, 303 N.Y. 498, 104 N.E.2d 872 (1952); Cornbrooks v. Terminal Barber Shops, Inc., 282 N.Y. 217, 26 N.E.2d 25 (1940); Spector v. Mermelstein, 485 F.2d 474 (2d Cir. 1973).

Plaintiff has the burden of proving that the publication of the falsehood was a material element or substantial cause of his inability to get a job. Plaintiff's own expert witnesses, Christopher Christian and Everard Lawrence, executive placement consultants, point instead to G & W's justified refusal to recommend him as the substantial cause of his joblessness. Christian testified that he stopped any attempts to place plaintiff with Sunshine Biscuit Company when G & W would not recommend him. Lawrence testified that, even before the article was published, he had withdrawn a job offer made to plaintiff because G & W would not recommend him. Since plaintiff has not proved that defendants' negligence was a substantial cause of his inability to secure employment, we need not address the question of damages in respect to this claim.

Since plaintiff has proved that defendants' negligence caused serious damage to his reputation and caused him to suffer pain and mental anguish on his part, we find that damages for those injuries are appropriate. We do, however, mitigate the damages herein awarded by taking into consideration Lawlor's conduct, which was by no means free from wrong. We thus conclude that $45,000 is a fair recovery against defendants Billings and Report under the circumstances.

### G & W'S COUNTERCLAIM AGAINST LAWLOR

G & W counterclaims against plaintiff for declaration of a constructive trust on its behalf of all profits made by the Mark Group and for damages.

At trial, G & W abandoned its claim for damages but presented evidence to support its claim for declaration of a constructive trust. G & W contends that, since Lawlor admitted that the Mark Group received $11,700 in fees and conceded that these fees always belonged to G & W, we should declare a constructive trust in that amount for G & W.[28]

The law of New York provides that when an employee of a corporation takes confidential information from it and uses such information to benefit his own enterprise, thus placing himself in a conflict of interest, the employer is entitled to the declaration of a constructive trust of all profits made by the enterprise.[29]

Plaintiff argues that, although the Mark Group originally made $11,700 in profits, he authorized that $3,000 of these profits be paid to Stephen Markham, as salary for working for the enterprise, and that this amount should be deducted from the $11,700. However, plaintiff admitted that he paid the $3,000 to Markham without authorization from G & W.

We conclude, therefore, that plaintiff must turn over $11,700 to defendant G & W. We impose a constructive trust of $8,698.50, now on deposit in account No. 27–45804 at the New York Bank for Savings, in the name of Richard Ives Rudell, and direct Rudell to turn over this fund to G & W. We grant judgment for $3,001.50, the difference between the amount on deposit and the $11,700, against plaintiff in favor of defendant G & W.

The foregoing opinion constitutes this court's findings of fact and conclusions of law, in accordance with Rule 52, Fed. R.Civ.P.

Accordingly, we grant judgment:

(1) in favor of defendants David N. Judelson and G & W against plaintiff dismissing the first claim for relief;

(2) in favor of defendants Martin S. Davis and G & W against plaintiff dismissing the second claim for relief;

---

28. G & W also contends that it is entitled to the compensation it paid to Lawlor during the period he operated the Mark Group. We are precluded from considering this claim as G & W failed to amend its pleadings to include it.

29. Sialkot Importing Corp. v. Berlin, 295 N. Y. 482, 68 N.E.2d 501 (1946); Harry R. Defler Corp. v. Kleeman, 19 N.Y.2d 694, 278 N.Y.S.2d 883, 225 N.E.2d 569 (1967).

(3) in favor of plaintiff against defendants Report and Cynthia A. Billings on the third claim for relief, in the amount of $45,000;

(4) in favor of defendant Martin S. Davis against plaintiff dismissing the third claim for relief;

(5) in favor of defendant G & W against plaintiff on the first, third and fourth counterclaims imposing a constructive trust of $8,698.50, now on deposit in account No. 27–45804, at the New York Bank for Savings, in the name of Richard Ives Rudell, and directing Rudell to turn over this fund to G & W;

(6) in favor of defendant G & W against plaintiff on the first, third and fourth counterclaims, in the amount of $3,001.50; and

(7) in favor of plaintiff against defendant G & W dismissing the second counterclaim.

Settle judgment and decree within ten (10) days.