AUGUSTINO TOSTI *vs.* HENRY AYIK & another.[1]

Middlesex.   December 3, 1984. — April 10, 1985.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, & O'CONNOR, JJ.

*Labor,* Federal preemption. *Libel and Slander. Jurisdiction,* Labor case. *Statute,* Construction. *Evidence,* Business record, Relevancy and materiality. *Practice, Civil,* Mistrial, Judgment notwithstanding verdict, Verdict. *Damages,* Libel. *Interest.*

Federal labor law did not preempt a State court's subject matter jurisdiction over an action arising from the publication in a local union newspaper of allegedly libelous statements, to the effect that the plaintiff, while a foreman in an automobile manufacturing plant, had engaged in "bargaining unit" work, contrary to a collective bargaining agreement then in force, and that he had punched repair tickets without the requisite repair work being done. [485-486]

The judge at a libel trial correctly instructed the jury that a labor union local's vicarious tort liability for the alleged libelous statements could be proved by a preponderance of the evidence. [486-488]

At the trial of a civil action the judge correctly excluded from evidence certain memoranda taken from an employer's personnel files, which were offered as business records, where the proponent failed to show that it was the business duty of the authors to prepare such memoranda in the regular course of business. [488-489]

At the trial of a libel action arising from the publication of an article in a local union newspaper, the judge did not abuse his discretion in admitting evidence of a statement made three years earlier by the union's shop chairman to the effect that he would "get" the plaintiff for his opposition to a union strike, where the statement was relevant to establish a possible union motive for the alleged libel. [489-490]

At the trial of a civil action the judge acted properly within his discretion in denying the defendants' motion for a mistrial and instead giving curative instructions to the jury, after the plaintiff's disclosure, during his direct examination, of a settlement he had received in a related case. [490]

At the trial of an action arising from the publication of allegedly libelous statements in a local union newspaper, the jury were warranted in finding, on clear and convincing evidence, that the statements were published

[1] United Auto Workers, Local 422.

with actual malice as defined in *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 279-280 (1964), and the jury were justified in imputing the author's state of mind to the union for the purpose of establishing the union's vicarious liability. [491-494]

In a libel action against a labor union local and the author of certain statements published in the union newspaper, the judge correctly denied the defendants' motions for judgment notwithstanding the verdicts and for a new trial. [494-495]

In an action arising from the publication of alleged libelous statements in a union newspaper concerning the plaintiff, a foreman in an automobile manufacturing plant, an award of $495,000 damages against the union was clearly excessive, and reflected impermissible considerations, where, although the jury could conclude from the evidence that the plaintiff had lost his employment as a result of the statements, the record reflected no proof that the plaintiff's failure to find full-time employment for an eleven-year period was the result of the tortious acts and where evidence of other consequences to the plaintiff was sparse. [495-499]

In computing interest on verdicts for the plaintiff in a civil action, the judge correctly gave retroactive effect to the twelve percent interest rate fixed by G. L. c. 231, § 6B, as amended through St. 1982, c. 183. [499-500]

TORT. Writ in the Superior Court dated August 6, 1973.

Following review by the Supreme Judicial Court reported in 386 Mass. 721 (1982), the case was retried before *Rudolph F. Pierce,* J.

The Supreme Judicial Court granted a request for direct appellate review.

*Gary R. Greenberg* for the defendants.

*Robert L. Bouley* (*Karen M. Thursby* with him) for the plaintiff.

HENNESSEY, C.J. This is an appeal by the defendants Henry Ayik and United Auto Workers, Local 422 (union), from judgments entered against them in the Superior Court. In that action the plaintiff alleged that he was the subject of a defamatory article, written by Ayik and published in the union's newspaper. The article, which appears in the margin,[2] alleged that the plain-

---

[2] "On Monday, June 7th [1971,] at 11:34 P.M. Gus Tosti foreman in the electrical hole, was working on job # 603677, a green 4 door Pontiac, T37. Pete Hanningson (rank unknown) was standing guard next to him. This is how Gus repairs cars. He has an inspection punch, #K2 and if he

tiff, who was employed as a foreman for General Motors Corporation (G.M.), was engaging in "bargaining unit" work, i.e., union work, contrary to the provisions of the union's contract with the company. Specifically, the article accused the plaintiff of punching vehicle repair tickets without performing the requisite repair work.[3] The newspaper was distributed to union and management personnel on June 15, 1971. The plaintiff was suspended on the morning following the distribution, after being called to the plant manager's office, where mention of the article was made. On June 18, 1971, G.M. discharged the plaintiff for allegedly punching the vehicle repair tickets of unrepaired vehicles.

In 1973, the plaintiff brought an action against several representative officers and members of the union for libel and tortious interference with an employment relationship.[4] The jury returned verdicts against the union and against two of the individual defendants, Henry Ayik and Baheege Ayik.[5] The defendants appealed and this court reversed the judgments and ordered a new trial. *Tosti* v. *Ayik,* 386 Mass. 721 (1982) (*Tosti I*).

reverses the punch it's K5. He was punching all the items on the ticket. This sort of thing goes on constantly. We have men who work in the Inspection Department checking these cars for defects. After writing the defects down the foremen fix them by punching the ticket out. Now, I understand why so many cars are shipped from the electrical hole. GM's mark of excellence means nothing to them. If you're ever picked as a driver for the electrical hole first, blow the horn, next try the brakes and good luck!!"

[3] The plaintiff acknowledged that he performed repairs and punched repair tickets in violation of the union's contract but denied that he had ever punched an item that he had not personally repaired.

[4] At the time the plaintiff commenced this action, a labor union, as an unincorporated voluntary association, could not be sued in its own right. *Members of Bakery & Confectionary Workers Int'l Union, Local 458* v. *Hall Baking Co.,* 320 Mass. 286 (1946). However, we subsequently altered this rule and held that unions will be considered "legal entities for the purpose of suing or being sued." *DiLuzio* v. *United Elec., Radio & Mach. Workers, Local 274,* 386 Mass. 314, 314 (1982).

[5] At the first trial, the parties stipulated to dismissal, without prejudice, of all counts filed against individual defendants other than Henry Ayik, author of the article, and Baheege Ayik, shop chairman of the union.

Upon retrial, the jury found for all defendants on the plaintiff's claim of tortious interference with an employment relationship. It further found for the defendant Baheege Ayik on the libel claim. However, the jury returned verdicts for libel against Henry Ayik in the amount of $5,000, and against the union in the amount of $495,000.[6] Ayik and the union unsuccessfully moved for judgment notwithstanding the verdicts and for a new trial on the libel counts. Both defendants appealed and we granted their application for direct appellate review.

On appeal, the defendants argue that (1) the subject matter jurisdiction of the State court was preempted by Federal labor law; (2) the judge erred in failing to require "clear and convincing evidence" of the union's liability for Ayik's actions; (3) various evidentiary rulings constituted reversible errors; (4) the plaintiff failed to prove Ayik's malice by clear and convincing evidence and therefore the defendants were entitled to directed verdicts; (5) the judge erred in denying their motions for judgments notwithstanding the verdicts or, alternatively, for a new trial; (6) the damage awards were inconsistent and the award against the union was excessive; (7) interest on the awards was erroneously computed due to the judge's misinterpretation of G. L. c. 231, § 6B. We affirm the judge's rulings on all issues, except as regards the excessive damages awarded against the union.

1. *Preemption.*

The defendants contend that State courts lack subject matter jurisdiction over the plaintiff's libel claim as a result of the recent United States Supreme Court decision in *Local 926, Int'l Union of Operating Eng'rs* v. *Jones,* 460 U.S. 669 (1983). We disagree. In previously considering the defendants' preemption claim, we stated that "Federal labor law preempts State libel law to the extent that defamatory statements made in the context of a labor dispute are actionable only if made with knowledge of their falsity or with reckless disregard of the

---

[6] With interest added pursuant to G. L. c. 231, § 6B, judgment was entered against Ayik individually in the amount of $5,866.70 and against the union in the amount of $580,803.30.

truth. *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers* v. *Austin,* 418 U.S. 264, 273 (1974). *Linn* v. *United Plant Guard Workers Local 114,* 383 U.S. 53, 61 (1966). In other words, State courts may grant relief in such defamation actions only if the defamatory statements were made with actual malice, as defined in *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 279-280 (1964)." *Tosti I, supra* at 723.[7] The Supreme Court's decision in *Local 926, Int'l Union of Operating Eng'rs, supra,* did not change, but rather reaffirmed, this rule. There the Court held that a cause of action against a union for tortious interference with an employment relationship was preempted because the claim was not "so deeply rooted in local law" as to outweigh "the interference with the federal labor law that prosecution of the state action would entail." 460 U.S. 669, 683 (1983). At the same time, however, the Court distinguished and reaffirmed its earlier holding in *Linn* v. *United Plant Guard Workers Local 114, supra,* "that an action for a malicious and injurious libel in the course of a labor dispute . . . was not pre-empted since it was unprotected conduct and since remedying injury to reputation was of only slight concern to the national labor policy and was a matter deeply rooted in state law." *Local 926, Int'l Union of Operating Eng'rs, supra* at 681 n.11. We therefore see no reason to reconsider the defendants' preemption claim and conclude that our decision in *Tosti I, supra* at 723, remains controlling.

2. *Union Liability.*

The defendants claim that the judge erred in instructing the jury that, in order to hold the union liable for Ayik's article, "the plaintiff must prove by the greater weight of the believable evidence that either or both defendants were acting on behalf of the local and within the scope of their responsibilities for the local when the material in question was published." They contend that G. L. c. 149, § 20B, which is modeled after § 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106 (1982),

---

[7] In *Tosti I, supra,* we held that "the article in question here was published in the context of a labor dispute" and therefore "[jury] instructions on actual malice need [to] be given."

requires proof of a union's vicarious tort liability by clear and convincing evidence.

General Laws c. 149, § 20B, inserted by St. 1935, c. 407, § 1, states: "No officer or member of any association or organization, and no association or organization, participating or interested in a labor dispute . . . shall be held responsible or liable in any court for the unlawful acts of individual officers, members or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof." In *Tosti I, supra* at 723-724, we noted that the article in question was "published in the context of a labor dispute" because "[a] dispute over supervisory personnel doing bargaining unit work is a controversy concerning terms and conditions of employment." See G. L. c. 149, § 20C (*c*). We stated that "[w]e cannot separate the allegedly defamatory statement from the protected activity concerning the terms and conditions of employment." *Tosti I, supra* at 724.

General Laws c. 149, § 20B, however, was intended to govern union liability in actions arising from violent labor disputes, such as injunction and contempt proceedings. The statute was originally enacted as § 1 of St. 1935, c. 407, "An Act relative to injunction and contempt procedure in labor disputes." "While the title to an act cannot control the provisions of the statute, the title may be used for the purpose of ascertaining its proper limitation." *Commonwealth* v. *Graham,* 388 Mass. 115, 120 (1983), and cases cited. We have noted in the past that the enactment of c. 407 "followed a recommendation of the Governor that the laws relating to injunctions in labor disputes 'should be liberalized and strengthened,' and . . . that the Norris-LaGuardia Act should be adopted 'as a basis for the drafting of the required state legislation.'" *Simon* v. *Schwachman,* 301 Mass. 573, 581 (1938), quoting 1935 Senate Doc. No. 1. See *Fashioncraft, Inc.* v. *Halpern,* 313 Mass. 385, 389 (1943); *Mengel* v. *Superior Court,* 313 Mass. 238, 245 (1943).

Our interpretation of the scope of G. L. c. 149, § 20B; is bolstered by the United States Supreme Court's discussion of

the purpose of the Norris-LaGuardia Act. "[T]he simple concern of Congress was that unions had been found liable for violence and other illegal acts occurring in labor disputes which they had never authorized or ratified and for which they should not be held responsible. . . . The straightforward answer was § 6, with its requirement that when illegal acts of any individual are charged against one of the major antagonists in a labor dispute — whether employer or union — the evidence must clearly prove that the individual's acts were authorized or ratified." *Ramsey* v. *UMW,* 401 U.S. 302, 310 (1971). See *United Bhd. of Carpenters* v. *United States,* 330 U.S. 395, 403 (1947).

Other jurisdictions which have enacted legislation patterned after the Norris-LaGuardia Act have held that their analogous statutes do not apply to cases charging unions with tort liability. See, e.g., *Nelson* v. *Haley,* 232 Ind. 314, 318 (1953); *Buchanan* v. *International Bhd. of Teamsters,* 94 Wash. 2d 508, 511 (1980). While the Connecticut cases relied upon by the defendants do involve union tort liability, there too the alleged torts arose in the context of a violent labor dispute. In *Benoit* v. *Amalgamated Local 299 United Elec. Radio & Mach. Workers,* 150 Conn. 266, 274-275 (1963) and *United Aircraft Corp.* v. *International Ass'n of Machinists,* 161 Conn. 79, 87-88 (1971), cert. denied, 404 U.S. 1016 (1972), the court applied the analogous Connecticut statute where the injuries suffered resulted from assaults and batteries associated with union picketing.

For these reasons, we conclude that the labor dispute encompassing the libel alleged here is beyond the intended scope of G. L. c. 149, § 20B. We therefore affirm the judge's ruling regarding the standard of proof required to impose liability on the union for publication of Ayik's article.

3. *The Judge's Evidentiary Rulings.*

The defendants challenge three of the judge's evidentiary rulings and claim each error provides ground for reversal. First, they contend that the judge erred in refusing to admit purported business records of G.M. regarding the plaintiff's termination. The defendants sought to introduce as business records, pur-

suant to G. L. c. 233, § 78, four memoranda from G.M.'s personnel files which were prepared in connection with the company's investigation of the plaintiff's conduct. The documents contained information from secondary sources as well as from the personal knowledge of their authors.

Although the judge failed to disclose the basis for his exclusion of the documents, we infer from his ruling that he was not satisfied that the statutory prerequisites had been met. *Omansky* v. *Shain,* 313 Mass. 129, 132 (1943). Because the defendants failed to show that it was the business duty of each of the authors to prepare such memoranda in the regular course of business, they failed to comply with at least one of the prerequisites to G. L. c. 233, § 78. See *Wingate* v. *Emery Air Freight Corp.,* 385 Mass. 402, 406 (1982) ("The preparer's hearsay sources must carry the same indicia of reliability, arising from regularity and business motives, that bring his own act of recording the information within the statutory exception"); *Kelly* v. *O'Neil,* 1 Mass. App. Ct. 313, 316 (1973) (second level of hearsay inadmissible under G. L. c. 233, § 78).

The defendants argue that even if G.M.'s records were inadmissible under G. L. c. 233, § 78, the judge should have ruled them admissible as past recollections recorded. However, since nothing in the record suggests that the defendants offered the documents for this purpose, they may not rely on this ground for the first time on appeal. *National Granite Bank* v. *Tyndale,* 179 Mass. 390, 393-394 (1901).

The defendants also contend that the judge erred in admitting a statement allegedly made by the defendant Baheege Ayik in 1968, to the effect that he intended to "get" the plaintiff for the latter's opposition to a union strike that year. The defendants moved in limine to exclude the statement as irrelevant and prejudicial. The plaintiff argued that the statement was relevant to establish a possible union motive for the alleged libel.

We have stated that, "[i]n determining whether the evidence offered serves any valid purpose we apply the rule that it must merely render the desired inference more probable than it would be without the evidence." *Green* v. *Richmond,* 369 Mass. 47,

59 (1975). In "the great majority of instances," the offering party is entitled to the evidence. *Id.* If it is possible that the probative value of the evidence is outweighed by its prejudicial effect, the question of admissibility is "determined in the sound discretion of the judge." *Id.* at 60.

We cannot say the judge abused his discretion in admitting the challenged statement. While the fact that the statement was made three years prior to the publication of the article in question may affect the weight it should be given, remoteness in time does not render the statement irrelevant. *Sherburne* v. *Meade,* 303 Mass. 356, 360 (1939). See *Murray* v. *Foster,* 343 Mass. 655, 657 (1962) (whether evidence is too remote in time for purpose offered is decision squarely within the discretion of trial judge).

Finally, the defendants charge that the judge abused his discretion in denying their motion for a mistrial. The defendants moved for a mistrial after the plaintiff referred, during his direct examination, to a separate suit he had brought against G.M. which he subsequently settled for $6,048 in severance pay. The defendants objected to the plaintiff's testimony as irrelevant and prejudicial since the jury could incorrectly infer that the settlement referred to represented an acknowledgment by G.M. that the plaintiff was wrongfully discharged. In response to their objection, the judge instructed the jury to disregard any references to other lawsuits and, pursuant to a stipulation of the parties, the jury were also informed that the sum received by the plaintiff represented accrued benefits in the form of severance pay. The judge reasonably concluded that these curative steps defused the prejudicial effect of the plaintiff's testimony. We are satisfied that there was no abuse of discretion in his denial of the defendants' motion for a mistrial. See *Riley* v. *Davison Constr. Co.,* 381 Mass. 432, 444-446 (1980) (motion for mistrial properly denied where judge's clarifying instructions cured juror confusion); *Shea* v. *D. & N. Motor Transp. Co.,* 316 Mass. 553, 555 (1944) (judge "not obliged to declare a mistrial, provided he adequately guarded against all improper effect").

### 4. *Evidence of Malice.*

The defendants next claim error in the judge's denial of their motions for directed verdicts. They contend that the plaintiff failed to show, by clear and convincing evidence, that the article in question was published with actual malice and therefore the jury should not have been allowed to decide the libel issue. We disagree. As a general rule, in considering a motion for a directed verdict, "[t]he question is whether the evidence, construed most favorably to the plaintiff, could not support a verdict for the plaintiff." *Poirier* v. *Plymouth,* 374 Mass. 206, 212 (1978). In defamation cases governed by the *New York Times Co.* v. *Sullivan* standard, we are under a constitutional obligation to determine "whether the jury would be warranted in concluding that malice was proved by clear and convincing evidence." *Stone* v. *Essex County Newspapers, Inc.,* 367 Mass. 849, 870 (1975). On appeal "those portions of the record which relate to the actual-malice determination must be independently assessed." *Bose Corp.* v. *Consumers Union of U.S., Inc.,* 466 U.S. 485, 514 n.31 (1984). If the facts, considered in the light most favorable to the plaintiff, were sufficient for the jury to find clear and convincing evidence[8] of the defendants' malice, then the judge properly denied the directed verdict motions.

Before reviewing the facts before the jury, we reiterate that "[a]ctual malice is not necessarily proved in terms of ill will or hatred, but is proved rather by a showing that the defamatory falsehood was published with knowledge that it was false or reckless disregard of whether it was false." *Stone, supra* at 867. For the jury to find that a publication was made in reckless disregard of the truth, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Id.,* quoting

---

[8] The plaintiff claims that the clear and convincing standard of proof should not apply to libel actions against labor unions where the *New York Times* malice standard is adopted by analogy rather than constitutionally mandated. *Linn* v. *United Plant Guard Workers Local 114,* 383 U.S. 53, 64-65 (1966). If there was error it was rendered harmless by the jury's verdict for the plaintiff based upon a clear and convincing standard of proof.

*St. Amant* v. *Thompson,* 390 U.S. 727, 731 (1968). "[T]he test is entirely a subjective one. . . . [T]he jury must find that such doubts were in fact entertained by the defendant, or by the defendant's servant or agent acting within the scope of his employment." *Stone, supra* at 868. In order to determine the defendant's state of mind, the jury are entitled to draw inferences from the objective evidence. *Id.*

Based upon the evidence presented, the jury could have found the following facts relevant to their determination of the defendants' malice. On June 7, 1971, the night in which the defendant Ayik claimed to make the observations contained in his article, he was "chasing stock" for as many as forty repairmen. Consequently, he was away from the electrical hole area, where both he and the plaintiff were stationed, for substantial periods of time, including the fifteen minute period prior to making the observations alleged in his article. Ayik testified that after returning to his work area, he watched the plaintiff go down a line of six cars, take repair tickets off the windshields, and punch the repair tickets. He then confronted the plaintiff, wrote down the job numbers of the cars, and informed the plaintiff that he intended to file a grievance.

Despite the fact that his article refers to cars leaving the electrical hole with defective horns and brakes, potential safety hazards, Ayik conceded that he did not know how to read the repair tickets and therefore had no idea what repairs were actually designated on the tickets. Nor did he claim to know whether any of the cars with tickets punched by the plaintiff had safety problems or improper repairs. When Ayik was asked why the plaintiff could not have made the designated repairs while the defendant was out of the area, he replied, "Because I watched [the plaintiff] in a three-month period, and he was out in that repair yard punching tickets and flagging them. . . . And they were never repaired." Ayik testified that during April and May of 1971, he observed the plaintiff two or three nights a week punching tickets on cars in the repair yard without ever making repairs. He further testified that in writing the article, he "wasn't complaining about the repair," but "only complaining about the punch. That's all I wanted taken away was the punch."

Contrary to Ayik's testimony, the plaintiff stated that he did not work the night shift during April and May of 1971, the time in which the defendant claimed to have observed him punching tickets of unrepaired vehicles. Although he acknowledged that he had performed minor repairs and punched repair tickets in violation of the union contract, including the night of June 7, 1971, the plaintiff testified that he never punched an item on an unrepaired vehicle.

This evidence, if believed by the jury, was sufficient to provide clear and convincing proof[9] that Ayik either published his article based on fabricated observations of the plaintiff or, at the least, entertained serious doubts as to the truth of his allegations. The defendant conceded that he did not particularly care whether the plaintiff failed to repair the vehicles. Instead, he testified that he was motivated to write the article because the plaintiff was performing bargaining unit work, i.e., punching repair tickets. The jury could therefore have found that this motive led the defendant to either fabricate the other charges or to make his accusations based on suspicions and not facts. This conclusion would have been particularly warranted if the jury found that the defendant could not have observed the plaintiff on the job during April and May. The defendant testified that his prior observations of the plaintiff during these months formed the "sole" basis for his allegation that the plaintiff performed no repairs on the night of June 7, 1971. Because the jury found that the defendant Ayik was acting within the scope of his union responsibilities when he wrote the article and submitted it for publication, they were justified in imputing his state of mind to the union for the purpose of establishing the union's vicarious liability. *Cantrell* v. *Forest City Publishing Co.,* 419 U.S. 245, 253-254 n.6 (1974). *Stone, supra* at 868.

---

[9] "Clear and convincing proof involves a degree of belief greater than the usually imposed burden of proof by a fair preponderance of the evidence, but less than the burden of proof beyond a reasonable doubt imposed in criminal cases." *Stone, supra* at 871. The evidence must be sufficient to convey to a "high degree of probability" that the defendant acted with substantial doubts about the truth of the statement. *Callahan* v. *Westinghouse Broadcasting Co.,* 372 Mass. 582, 588 n.3 (1977).

For these reasons, we conclude that the jury would have been warranted in finding that the defendants' malice was proved by clear and convincing evidence. Therefore the judge properly denied the defendants' motions for directed verdicts. This is true regardless of whether he or we would personally have been convinced by the same evidence. *Stone, supra* at 870 n.11. *Id.* at 873 (Quirico, J., concurring in part and dissenting in part).

5. *Motion for a New Trial.*

The defendants contend that their motions for judgments notwithstanding the verdicts or, in the alternative, for a new trial should have been granted. When acting on a defendant's motion for judgment notwithstanding the verdict, the judge's task, "taking into account all the evidence in its aspect most favorable to the plaintiff, [is] to determine whether, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, the jury reasonably could return a verdict for the plaintiff." *Rubel* v. *Hayden, Harding & Buchanan, Inc.*, 15 Mass. App. Ct. 252, 254 (1983). Conflicting evidence alone does not justify judgment notwithstanding the verdict. *O'Shaughnessy* v. *Besse,* 7 Mass. App. Ct. 727, 729 (1979). "[I]t is of no avail for the defendant to argue that there was some or even much evidence which would have warranted a contrary finding by the jury." *Curtiss-Wright Corp.* v. *Edel-Brown Tool & Die Co.,* 381 Mass. 1, 4 (1980), quoting *Chase* v. *Roy,* 363 Mass. 402, 407 (1973). The court may not substitute its judgment of the facts for that of the jury. *O'Shaughnessy, supra* at 728. These well-settled rules regarding the respective roles of judge and jury do not change in defamation cases. It remains the case that "[w]hen the testimony of a witness is not believed, the trier of fact may simply disregard it." *Bose Corp.* v. *Consumers Union of U.S., Inc.,* 466 U.S. 485, 512 (1984). Even if conflicting evidence was introduced from which the jury could have found that the charges against the plaintiff were either true or not made with actual malice, the jury were free to believe or disbelieve the evidence presented. We have already concluded that the jury, crediting the evidence most favorable to the plaintiff, would

have been warranted in reaching their verdicts. Consequently, there was no error in the judge's denial of the defendants' motions for judgments notwithstanding the verdicts.

As to the defendants' alternative motions for a new trial, it is clear from our summary of the evidence, above, that these motions (except as to the amount of damages; see discussion, *infra*) rested in the sound discretion of the judge, and consequently there was no error in his denial of the motions.

6. *Damages.*

The defendants further assert that the libel verdicts are inconsistent, in light of: (1) the verdicts for them on the plaintiff's count for intentional interference with an employment relationship and (2) the disparity in the $5,000 verdict against Ayik and the $495,000 verdict against the union. By failing to raise this objection prior to the dismissal of the jury, the defendants deprived the judge of the opportunity to correct any possible errors in the jury's deliberations. Consequently, they waived their right to attack the verdicts as inconsistent on appeal. *Bradley* v. *Fessenden,* 349 Mass. 429, 429-430 (1965). *Feaver* v. *Railway Express Agency, Inc.,* 324 Mass. 165, 169 (1949).

There is merit, however, in the defendants' contention that the verdict against the union is excessive. We agree that the $495,000 award is clearly excessive and "may impermissibly chill the exercise of First Amendment rights by promoting apprehensive self-censorship." *Stone, supra* at 860. In defamation cases, "[b]ecause of constitutional considerations, and the potential difficulties in assessing fair compensation . . . both trial and appellate judges have a special duty of vigilance in charging juries and reviewing verdicts to see that damages are no more than compensatory." *Id.* at 861. Our Federal labor policy similarly demands heightened scrutiny in reviewing libel awards against unions. "[I]n view of the propensity of juries to award excessive damages for defamation, the availability of libel actions may pose a threat to the stability of labor unions." *Linn* v. *United Plant Guard Workers Local, 114,* 383 U.S. 53, 64 (1966). See *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers* v. *Austin,* 418 U.S. 264, 291 (1974) (Douglas, J., concurring) ("community attitudes toward unionization" influence libel awards against unions).

Both the Legislature and this court have prohibited awards of punitive damages in libel actions, even upon proof of actual malice. *Stone, supra* at 860-861. G. L. c. 231, § 93. The plaintiff is entitled only to fair compensation for his actual damages, including his mental suffering and harm to his reputation, and for any special damages he has suffered which have been pleaded and proved. *Stone, supra* at 860. Because First Amendment rights are at stake, we are not slow to pronounce a verdict excessive in defamation cases, *Stone, supra* at 861, even though by doing so we must necessarily substitute our assessment of reasonable damages for that of the jury. See *Curtis Publishing Co.* v. *Butts,* 388 U.S. 130, 160 (1967) (plurality opinion) (constitutional guarantee of freedom of speech and press is served by judicial control over excessive verdicts).

In this case, the judge instructed the jury that if they decided the plaintiff lost his employment as a result of the defamation, they could hold the defendants "responsible for any damages resulting from the loss." We assume from the size of the verdict that the jury probably found that the defendants caused the plaintiff's discharge by their libellous publication. However, we are not convinced that the evidence presented by the plaintiff regarding the consequences of his discharge was sufficient to justify a $495,000 award.

The testimony regarding the plaintiff's employment with G.M. established the following facts. In 1971, as a foreman of drivers of unlicensed cars, he earned approximately $11,800 a year in base pay. From late August through late December of each year, the period in which production began on new automobile models, the plaintiff commonly worked substantial overtime hours and earned up to double or triple his base pay. However, overtime was not guaranteed and the plaintiff did not know how his overtime pay was calculated. At G.M. the plaintiff also received pension, stock, and medical benefits although he did not present any evidence as to their value. After the plaintiff was discharged, at the age of forty-four, he received $6,000 in severance pay. There was additional testimony by G.M. personnel that, by 1980, an employee in the

plaintiff's former position was earning some $27,600 a year in base pay.

The plaintiff also testified as to his yearly earnings from the time of his discharge in 1971 until the second trial in 1983. During those years he was employed on temporary jobs as a laborer, construction worker, and carpenter with yearly earnings ranging from a low of $2,300 to a high of $18,700. His total earnings during this period were approximately $124,000 compared to the estimated $224,000[10] he would have earned in base pay as a G.M. foreman.

There was evidence that the plaintiff and his family suffered financial hardship in the years after his discharge. However, where substantial damages are awarded as compensation for earnings allegedly lost as a result of defamation, courts will seek proof that a plaintiff's inability to find comparable work was actually caused by a defendant's tortious act. For example, in *Lawlor* v. *Gallagher Presidents' Report, Inc.,* 394 F. Supp. 721 (S.D.N.Y. 1975), the plaintiff, a former corporate officer, claimed that he was unable to obtain employment in his field as a result of defamatory statements concerning the circumstances of his resignation. In his mid-forties at the time of the libel, he sought damages of $95,000 per year until he reached retirement age. New York law, like our own, limits a plaintiff's recovery in defamation actions to compensatory damages that are proved by competent evidence. *Id.* at 733. The court denied the plaintiff's claim for lost earnings because he failed to prove that "the publication of the falsehood was a material element or substantial cause of his inability to get a job." *Id.* at 735. Similarly, in *Benassi* v. *Georgia-Pacific,* 62 Or. App. 698 (1983), modified, 63 Or. App. 672 (1983), the plaintiff alleged that as a result of his employer's slanderous remarks regarding his discharge, he was prevented from securing other employment and ultimately was

---

[10] We recognize that with overtime pay and employment benefits, the plaintiff could potentially have received significantly higher yearly earnings from G.M. However, on the basis of the record presented, we are unable to competently estimate the additional income he would have received from these sources.

forced to accept a position at a lower rate of pay. The court held there was insufficient proof of special damages because the plaintiff failed to show that he "would have obtained [employment] but for the currency of the slander." 62 Or. App. at 705. Because the plaintiff did not claim that any potential employers were aware of the defamatory statements, the court concluded that "it would be mere speculation to permit the jury to infer that the plaintiff was unable to obtain a new job . . . because of the defamation." 62 Or. App. at 709. In *Lawrence* v. *Jewell Cos.*, 53 Wis. 2d 656 (1972), the plaintiff also contended that he was unable to find steady employment as a result of defamatory statements made by his former employer. Noting that "[t]he record is devoid of any direct evidence that a slanderous statement was made to a prospective employer," *id.* at 660, that court concluded that the jury's compensatory award of $25,000 was excessive and reduced it to $12,000. *Id.* at 661-662.

While in this case the jury could conclude from the evidence that the plaintiff lost employment due to the defendants' article, that finding does not necessarily entitle the plaintiff to all future wages he would have otherwise earned from G.M. In *Hanson* v. *Innis,* 211 Mass. 301 (1912), we considered the damages due a foreman who had been discharged as a result of union demands. There we held that the plaintiff was entitled to recover his lost wages "past and future," *id.* at 306, because he produced evidence showing that his discharge and his inability to obtain other work were caused by the unlawful acts of the defendants. *Id.* at 305. In this case, the record presents no comparable proof that the plaintiff's failure to obtain full-time employment from 1971 through 1982 was due to the defendants' tortious acts. Cf. *Faulk* v. *Aware, Inc.*, 19 A.D.2d 464, 470 (N.Y. 1963) (potential employers testified they would not hire plaintiff as result of defamation).

In defamation cases, other causally related consequences, such as harm to reputation and mental suffering, are compensable where the awards are supported by competent evidence. *Stone, supra* at 860-861. Here, however, the evidence establishing such damages is sparse indeed. The record contains

testimony by the plaintiff's wife that the plaintiff was "shook up" on the day of his discharge and lay down when he returned home, which was very unusual for him to do. There was no suggestion that the plaintiff received any medical or psychiatric treatment as a result of the libel.

Given the evidence the plaintiff submitted as to proof of his damages, we conclude that the jury's award of $495,000 against the union was clearly excessive and impermissibly reflected prejudicial or punitive considerations.[11] Accordingly, we shall remand the case to the Superior Court where, upon a motion for a new trial under Mass. R. Civ. P. 59 (a), 365 Mass. 827 (1974), filed by the defendant union within a reasonable time after the rescript herein, the trial judge shall reconsider solely the issue of the excessive damages. Before a new trial is granted[12] the plaintiff shall, of course, under rule 59 (a), be given an opportunity to remit such sum as the judge considers excessive. *D'Annolfo* v. *Stoneham Hous. Auth.,* 375 Mass. 650, 661 (1978). Because First Amendment rights are at stake, the court must in this proceeding, and any subsequent proceedings which may follow in this case, bring close scrutiny to the damages assessed. See *Stone, supra* at 860.

7. *Interest.*

Finally, the defendants challenge the judge's computation of interest on the verdicts at a rate of 12% per annum from June 13, 1973, the date of the commencement of the action, to March 23, 1983, the date the judgments were entered. The judge awarded interest retroactively pursuant to G. L. c. 231, § 6B, which applies a 12% rate of interest "to all actions in which damages are assessed on or after the effective date of

---

[11] We note that during the course of their deliberation, the jury specifically inquired of the judge whether they could find the union liable for defamation "whether or not either defendant be liable of any charge."

[12] Any new trial herein will be confined to the issue of damages. Rule 59 has no specific limitation as to the issues available in such a retrial but the statutory predecessor to the rule (see G. L. c. 231, § 128, repealed by St. 1973, c. 1114, § 205), pursuant to what we think was sound policy, limited a new trial granted for excessive damages to that issue solely. *D'Annolfo* v. *Stoneham Hous. Auth.,* 375 Mass. 650, 662 (1978).

this act." St. 1982, c. 183, § 4.[13] The 1982 act became effective on July 1, 1982; damages were assessed against the defendants on March 23, 1983. Cf. *Patry* v. *Liberty Mobilehome Sales, Inc., ante* 270, 273 (1985) (where trial judge assessed plaintiff's damages in 1981, 12% interest rate did not apply).

Relying upon *Porter* v. *Clerk of the Superior Court,* 368 Mass. 116, 116 (1975), the defendants contend that G. L. c. 231, § 6B, was not intended to be fully retroactive in application. However, in the *Porter* case, the issue was whether St. 1974, c. 224, § 1, amending G. L. c. 231, § 6B, was to be given retroactive effect. The 1974 amendment "contained no provision comparable to § 4 of St. 1982, c. 183" and therefore *Porter* "is inapposite" when interpreting the statute as most recently amended. *Mirageas* v. *Massachusetts Bay Transp. Auth.,* 391 Mass. 815, 821 n.9 (1984). We therefore see no error in the judge's retroactive application of G. L. c. 231, § 6B.

8. *Conclusion.*

In sum, we conclude that (1) State court subject matter jurisdiction over the plaintiff's libel claim was not preempted by Federal law; (2) the jury were properly instructed as to the standard of proof to apply in determining the union's potential liability for its agent's actions; (3) the judge properly refused to admit G.M. documents as business records under G. L. c. 233, § 78, and properly denied the defendants' motion in limine and motion for a mistrial; (4) the defendants' malice was established by clear and convincing evidence; (5) the judge made no error in denying the defendants' motions for judgments notwithstanding the verdicts or (aside from the excessive damages) for a new trial; and (6) the judge correctly awarded interest pursuant to G. L. c. 231, § 6B.

---

[13] General Laws c. 231, § 6B, as amended through St. 1982, c. 183, § 2, states: "In any action in which a verdict is rendered or a finding made or an order for judgment made for pecuniary damages for personal injuries to the plaintiff or for consequential damages, or for damage to property, there shall be added by the clerk of the court to the amount of damages interest thereon at the rate of twelve per cent per annum from the date of commencement of the action even though such interest brings the amount of the verdict or finding beyond the maximum liability imposed by law."

The judgment against the individual defendant is affirmed. However, because the jury's damage award against the union was excessive, we remand the case to the Superior Court where, upon an appropriate motion by the defendant union, an order for remittitur is to be entered in an amount to be determined by the trial judge. If the opportunity for remittitur is declined by the plaintiff, a new trial is to be ordered in the case against the union, confined to the issue of damages.

*So ordered.*