# United States Court of Appeals
## For the First Circuit

No. 03-1242

JAMES R. FIORI,

Plaintiff, Appellee,

v.

TRUCK DRIVERS, LOCAL 170,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Boudin, Chief Judge,

Siler,* Senior Circuit Judge,

and Lynch, Circuit Judge.

Timothy P. Wickstrom with whom Tashjian, Simsarian & Wickstrom was on brief for appellant.
Charles J. Brucato, Jr. with whom Consigli and Brucato, P.C. was on brief for appellee.

January 7, 2004

*Of the Sixth Circuit, sitting by designation.

**BOUDIN**, <u>Chief Judge</u>.  James R. Fiori won a jury verdict against Truck Drivers Local 170 ("Local 170" or "the union"), a Massachusetts branch of the International Brotherhood of Teamsters ("Teamsters").  Fiori was awarded damages on two different claims but only the libel award, in the amount of $150,000 (as reduced by the judge) is challenged by the union on this appeal.  The background events are largely undisputed.

On May 2, 1991, while working for Tresca Brothers Sand and Gravel ("Tresca"), Fiori injured his back while shoveling gravel and began receiving workers' compensation of $428/week.  A few days later, Local 170 began a strike against Tresca that would last three years.  Fiori--a union member since 1982--participated in the strike by walking the picket lines three days a week for all three years.

Local 170 paid weekly strike benefits to union workers participating in a strike, ranging from $45/week at the beginning of the strike to $200/week by the end.  Fiori asked Ernie Tusino, Local 170's Secretary-Treasurer--the principal officer of Local 170, who had authority to speak for the union--whether he was allowed to receive these strike benefits in addition to workers' compensation.  Tusino said he could.  During the three-year strike, Fiori collected a total of $26,345 in strike benefits and more than $58,636 in workers' compensation payments.

The strike ended in 1994, and Fiori returned to work as a truck driver for other companies. In 1995 Fiori ran for vice-president of Local 170, and won. Soon after Fiori took office a power struggle began within both Local 170 and its parent Teamsters union. Both Fiori and Ernie Tusino supported James R. Hoffa, the son of former Teamsters president Jimmy Hoffa, in the Teamsters' 1996 presidential election. The other officers of Local 170 supported the incumbent, Ron Carey.

In spring 1996--in the midst of the national campaign--Teamsters president Carey removed Tusino from his position in Local 170, and replaced him with Richard Foley. Foley and other Local 170 officers began an investigation into Fiori's "double-dipping" (receiving both workers' compensation and strike benefits at the same time) during the Tresca strike several years before. Foley exchanged letters with Teamsters officials, who opined that double-dipping violated union rules.

In February 1997, Foley filed internal union charges against Fiori, and in March 1997, Local 170's executive board found Fiori guilty of double-dipping and removed him as vice president. Fiori was ordered to repay the strike benefits; he refused and was suspended from union membership on July 21, 1997. In the same month Foley sent all the union members a letter ("the Foley letter"),

written on official Local 170 stationary, that underlies this appeal.[1]

In substance, the Foley letter informed all union members that Fiori had improperly collected strike benefits and workers' compensation at the same time. The letter is factual in tone; it claims to present nothing but "the undisputed facts"; it states that Fiori had improperly received $26,345; and it emphasizes that this purloined sum was "your dues money." (emphasis in original). This letter was sent in July 1997, four months before the Local 170 election in which Fiori ran for (and lost) the position of business agent.

Fiori filed unsuccessful protests within the union challenging the Executive Board action, and then a complaint with the National Labor Relations Board. The NLRB heard evidence and concluded that Local 170's charges against Fiori were politically motivated retaliation: the charges were not brought until three years after Fiori stopped receiving benefits and began soon after he openly supported an opposition candidate. Local 170 was found to have committed an unfair labor practice, and the union was ordered to revoke its demand for repayment of strike benefits.

---

[1]At trial Fiori also introduced an unsigned, pro-Carey campaign flier that was circulated among union members sometime in 1996. That flier strongly criticized Fiori for receiving over $100,000 during the three-year strike period. The Foley letter is the focus of both sides' argument on appeal, however.

The NLRB decision did not issue until August 1998. In the meantime, the Local 170 elections had been held and Fiori had been defeated by eight votes for the position of business agent. Fiori filed the present action against Local 170 in federal district court. Only two claims survived the union's motions to dismiss and for summary judgment: Fiori's claims that he had been libeled under Massachusetts law and that his removal from office constituted retaliation in violation of the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 411(a)(5) (2000). See generally Linn v. United Plant Guard Workers, Local 114, 383 U.S. 53 (1966).

The jury found for Fiori on both counts. It awarded him $300,000 in compensatory damages on his libel claim and $234,500 in compensatory and punitive damages on his retaliation claim. On post-trial motions, the district judge reduced both awards through remittitur; the libel award was reduced to $150,000 because the judge concluded that the jury had not properly taken into account Fiori's duty to mitigate damages.

Local 170 now appeals, limiting itself to several different attacks on the libel award, all of which concede that the Foley letter was libelous. Local 170 first argues that there was insufficient evidence that the libel harmed Fiori in any way, so the claim should never have gone to the jury. There would be enough evidence for an award based on mental suffering even if Fiori's loss

of the election for business agent were disregarded; but, as we will see, the real issue turns out to be the election.

Under Massachusetts law, allowable defamation damages include "special damages"--proximately caused economic losses--and also (in the case of libel) any non-economic "harm to reputation and mental suffering." Shafir v. Steele, 727 N.E.2d 1140, 1146 (Mass. 2000); Ravnikar v. Bogojavlensky, 782 N.E.2d 508, 511 (Mass. 2003). The emotional distress need be no more than "outrage" and "anger" upon seeing the libelous statements, Shafir, 727 N.E.2d at 1146, since mental distress is the "natural result" of libel, id. (citing Markham v. Russell, 94 Mass. 573, 575 (Mass. 1866)).

Fiori testified that he felt "humiliated" when he saw the Foley letter, said that he had to deal with "a lot of accusations" from other union members, and explained that "there's not enough hours in the day to explain to the people that don't know you that it's inaccurate, it's not true, and that I didn't do anything wrong." He testified about his embarrassment and how he "didn't sleep good" after the accusations.

This mental distress is sufficient to allow the libel claim to go to the jury. See Shafir, 727 N.E.2d at 1146. The fact that Fiori admitted he had no physical symptoms besides minor sleep loss, sought no medical attention and took no medicine might limit the award that could reasonably be allowed for mental suffering. However, in this case mental suffering may be beside the point; as

-6-

the district judge concluded in his post-trial decision granting remittitur, the award was pretty clearly premised on an award of economic damages.

Tusino had testified (over objection) that the business agent job paid about $100,000.  Proof of mental anguish was modest.  Local 170 argues on appeal, "[t]he only explanation for the jury award of $300,000 on the libel claim is that the jury drew an impermissible inference that the plaintiff lost an election for a three-year term as Business Agent, at $100,000 per year."  We will assume arguendo that this inference was drawn by the jury; whether it was permissible is the next question.

The union presents its claim of error under two heads: first, that the evidence did not permit a rational jury to conclude that the libel caused Fiori's election loss, and second, that the judge should have granted the union's request for an instruction forbidding the jury to consider the election loss as a basis for economic damages.  The issue can largely, although not entirely, be dealt with under the first heading, that is, as a claim of jury error.

Ordinarily, a jury verdict on an issue of causation in fact--here, whether the libel likely caused the election loss--is reviewed with great deference, the court asking whether any rational jury could so find.  See Wortley v. Camplin, 333 F.3d 284, 295 (1st Cir. 2003).  But out of concern that libel judgments constrain free

-7-

speech, both federal and Massachusetts courts tend to be somewhat more searching in their review of defamation awards.[2] We begin by considering the basis for the jury's verdict and then return to the First Amendment concerns.

The issue is certainly close. The union's argument is terse; its brief relies primarily on one decision, Kirk v. Transport Workers Union, AFL-CIO, 934 F. Supp. 775, 790-92 (S.D. Tex. 1995), and one central point: the union claims that Fiori "failed to offer any evidence of the election, who voted, the number of votes, the voter's motives, the possibility of changing votes, etc." Thus, says the union, the record is "void" of evidence of harm. We begin with the evidence and then address precedent.

What the jury learned was that several months before Fiori ran for business agent, Foley had sent all 3,500 union members a letter on official stationary informing them that Fiori had improperly collected strike benefits and workers' compensation, depleting the members' dues money by over $25,000. The union does not now deny that this was libel, and one would expect it to be quite damaging in a union election. Here, the jury was also told by Fiori that he had to do a lot of explaining after the libel and that he had lost by only eight votes.

_____

[2]Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 508 (1984); Veilleux v. Nat'l Broadcasting Co., 206 F.3d 92, 106 (1st Cir. 2000); Tosti v. Ayik, 476 N.E.2d 928, 938 (Mass. 1985); Stone v. Essex County Newspapers, Inc., 330 N.E.2d 161, 169-70 (Mass. 1975).

Certainly there is an absence of <u>other</u> evidence concerning the election, which could conceivably have helped either side (and we will return to a probable explanation for this absence). But Fiori needed only to offer enough evidence to permit a rational jury to conclude that, more likely than not, the libel cost him the election. Without anything more, it seems to us reasonable, and no stretch at all, for a jury using its common sense to conclude that the libel likely changed a number of union votes. Could it also conclude that this cost Fiori the election?

Well, if hundreds of members voted in the election, we think that a rational jury could conclude that the Foley letter probably changed enough votes to cost Fiori the election. This is so even though some of the union members probably knew of the charge against Fiori and the Executive Board decision from other sources. After all, the letter went to everyone in the union, the criticism of Fiori was harsh (and according to the jury libelous) and--if we supposed that only half the union members voted--eight votes would represent less than one half of one percent of the vote. The story would be quite different if the union had only sixteen members.

The gap that remains is that there was apparently no evidence as to the number of members who actually voted in the election. But it is no great leap for a jury to suppose that if the union membership is 3,500, there were almost surely hundreds of votes in an election for a business manager position whose salary

alone suggests that the function was important. This kind of background assumption about how the world works is part of the jury's tool box. United States v. Guerrero-Guerrero, 776 F.2d 1071, 1075 (1st Cir. 1985), cert. denied sub nom Mosquera v. United States, 475 U.S. 1029 (1986).

The line between permissible inference drawing and undue speculation cannot be reduced to a single formula. United States v. Kirvan, 997 F.2d 963, 966 & n.2 (1st Cir. 1993). Here, based on the standards ordinarily applied to jury verdicts, we think that as a matter of probabilities the jury was not irrational. The only real question is one of policy: whether some higher level of certainty as to compensatory damages should be required because of First Amendment concerns, or whether de novo review should supplant deferential review of the jury's assessment of actual damages.

Yet libel claims are already constrained by demanding fault requirements, e.g., Gertz v. Robert Welch, Inc., 418 U.S. 323, 347 (1974), and de novo review of constitutional issues such as malice and falsity, e.g., Veilleux v. Nat'l Broadcasting Co., 206 F.3d 92, 108 (1st Cir. 2000). On the union's own premise that the award was based on the election loss, we are not concerned here with an amount of damages that is provocatively imaginative and might be a cloaked award of punitive damages--another matter where special scrutiny might well be warranted. The award, adjusted by the

remittitur, is the amount of real economic damages Fiori suffered if the libel caused his loss in the election.

Federal cases raising the evidentiary bar in the free speech context stress that the bar is raised only for issues implicating the First Amendment. In Veilleux, we said "the reviewing court does not extend the independent review standard to all determinations concerning a particular legal claim, but only to those that specifically involve the application of First Amendment law to specific facts." 206 F.3d at 107. Whether a libel was the but-for cause of subsequent economic loss does not directly implicate the First Amendment, as long as it is clear that the finding was not a hidden award of punitive damages. So we decline to hold that the evidence of damages was inadequate in this case.

The defendants cite Kirk, 934 F. Supp. at 790-92, as reaching the opposite conclusion. In Kirk, the district court was ruling pretrial on an assembly of claims growing out of an intra-union dispute, and among these many claims was one for libel based upon statements made in a union newsletter. The district court declined to dismiss the libel claim short of trial, but went on to dispose summarily of a claim that the defendants had through various means violated their federal labor law duty of fair representation. As to this claim, the court said that the duty was directed to conduct that implicated management-worker relations and did not apply to intra-union disputes.

To avoid this outcome, the plaintiffs had argued that relations with management <u>were</u> implicated by the defendants' libel because, had the conduct not occurred, the plaintiffs would later have won union elections and then taken leaves of absence from their other jobs to serve as union officials. This argument was dismissed by the district court as too thin a connection to implicate the duty of fair representation. Then the court added in a single sentence: "Moreover, it is far too speculative to suggest that, but for publication of the [libelous] newsletter, Plaintiffs would have been elected to executive positions within the Local Union." <u>Kirk</u>, 934 F. Supp. at 792.

In our case, the union's reliance on <u>Kirk</u> is, in the once familiar phrase, "close but no cigar." The quoted sentence may have been more than a throw-away line and, if so, may well have been defensible on the facts; one cannot tell because the facts concerning the possible causal connection are not discussed in the opinion. Regardless, the district court did not say that there could never be a firm connection between a libel and the loss of an election, nor could any such generalization be defended.

The adequacy of the evidence of a connection in our own case disposes of the claim that the jury should have been instructed not to consider the election, insofar as that claim rests on an insufficiency of the evidence argument. How far judges are <u>required</u> to instruct separately on the inadequacy of evidence as to separate

-12-

components of a damage claim is a complicated matter well left for another day. Cf. Interstate Litho Corp. v. Brown, 255 F.3d 19, 29 & n.11 (1st Cir. 2001), cert. denied 534 U.S. 1066 (2001).

So we come at last to the most curious issue in the case. The union points out that the trial judge said to counsel, prior to closing arguments, that "the matter of the election is not going to the jury." The union argues that whether or not the judge had to so hold, this ruling was the "law of the case" and prejudiced the union because in reliance on this statement defense counsel failed to address the election issue in closing argument. This, says the union, "at least" requires a new trial on damages.

Some further background is required. Early on in the case, the union filed a motion in limine asking the court to exclude all testimony relating to the election. The trial judge sensibly denied the motion, ruling that he would consider each piece of evidence as it was proffered. Not much evidence was presented concerning the election; conceivably Fiori's counsel worried that such damages were too speculative or he may have been trying to skirt the issue, hoping that the jury would make the connection on its own.

In any event, the judge said in mid-trial, after Fiori's testimony but before Tusino's testimony, that he had not seen evidence that put the election in issue, but "I have not told the plaintiff that under no circumstances can he attempt to offer [such]

-13-

evidence . . . ." The judge later allowed Tusino to testify, over the union's objection, that the salary of a business agent was approximately $100,000 a year. On appeal the union is not pursuing its evidentiary objection nor claiming that the salary of a business agent should not have been admitted.

After both sides presented evidence, Fiori sought an instruction that the jury could consider his loss of the business agent position; Local 170 sought an instruction that it could not. The judge declined to give either instruction, commenting--words now stressed by the union as prejudicing its position--that "the matter of the election is not going to the jury." Neither side mentioned election damages in their closing argument.

It is not clear what the district judge meant in his quoted comment; he did not refer to it in his post-trial ruling on damages. It might at first look as if at the time he was siding with the union and ruling that there was inadequate evidence on the election issue; but, of course, the judge also flatly refused to give an instruction barring jury consideration of the issue. Local 170 did not ask the judge to clarify his comment before closing arguments, nor did it ask for or receive a ruling that Fiori could not argue for damages based on the election in closing--a policing device that judges sometimes use in lieu of an instruction. See Richardson v. Bowersox, 188 F.3d 973, 980 (8th Cir. 1999); see also Herring v. New York, 422 U.S. 853, 862 (1975).

Under these circumstances, we agree that the defense may have been misled, but see no basis for reversal. A stray comment, and one necessarily cryptic in context (the court having refused to give the union's instruction) is not "law of the case"--a doctrine directed primarily to formal legal rulings. See, e.g., United States v. Vigneau, 337 F.3d 62, 67-68 (1st Cir. 2003). Nor, as it happens, would law of the case doctrine prevent the judge from altering his ruling--this happens from time to time--although it would likely require him to take account of justified reliance. Cf. Conley v. United States, 323 F.3d 7, 13 (1st Cir. 2003).

Still, if the judge had unfairly misled defense counsel as to the permitted scope of his closing argument, we could undo the mischief without regard to law of the case doctrine. But here, after the district court refused the union's request for an instruction, the union's counsel never sought a ruling on whether counsel could argue about the election issue. This failure to press the point may well have been tactically justified, for if the union sought such a ruling and the court ruled that it could argue the issue, Fiori's counsel would likely have argued it himself.

By not pressing for a ruling on what was open for argument, the union may have gambled (successfully) that Fiori's counsel would follow suit, focusing upon mental distress damages and never mentioning the lost business agent salary. This certainly reduced the chances that the jury would award economic damages on

-15-

its own; and if it did award them, the union still had its inadequate-evidence argument for appeal.  In any event, the union took its chances in failing to ask for a yes-or-no ruling as to what was open for argument to the jury.

Affirmed.